IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MAX SEIFERT,

          Plaintiff,

          vs.                    Case No. 11-2327-JTM

THE UNIFIED GOVERNMENT OF WYANDOTTE
COUNTY/KANSAS CITY, KANSAS, SHERIFF
DONALD ASH, AND UNDERSHERIFF LARRY
ROLAND

          Defendants.

MEMORANDUM AND ORDER

Plaintiff Max Seifert, a civilian analyst in the Wyandotte County Sheriff's Department, alleges in his Amended Complaint claims that Wyandotte County Sheriff Donald Ash and Undersheriff Larry Roland acted illegally in retaliating against him as a whistleblower. Seeking recovery from the Unified Government of Wyandotte County and Kansas City, Kansas, Seifert brings claims (1) under 42 U.S.C. § 1983, for retaliating against him in violation of his First Amendment right to report the results of an investigation arising from a 2003 traffic incident, (2) under *Monell* and 42 U.S.C. § 1983 for the defendant's retaliatory policies, (3) under 42 U.S.C. § 1985(2) for conspiracy to deprive him of his First Amendment rights, and (4) for illegal retaliation in violation of Kansas law protecting whistleblowers. The defendants has moved to dismiss certain claims raised by Seifert.

***Factual Background***

In July 2003, Seifert was employed as a detective by the Kansas City, Kansas Police, and was assigned to investigate the facts and circumstances surrounding a car collision involving a civilian driver, Barron Bowling, and a DEA agent, Timothy McCue. Seifert alleges that his investigation revealed that the collision was an accident, but that Agent McCue had unlawfully beaten Bowling during his arrest. According to Seifert, he was pressured, shunned, and criticized by his police colleagues and superiors, who complained that he had documented Bowling's allegations and injuries.

The district attorney charged Bowling with the felony of criminal damage to property for allegedly intentionally ramming McCue's car, along with two misdemeanors. At Bowling's criminal trial, Seifert testified for the defense. The jury acquitted Bowling of the felony charge.

After the trial, the prosecutor complained to the deputy chief of police, Colonel Steve Culp, about Seifert's contact with defense counsel. Culp asked Internal Affairs to investigate Seifert's handling of the Bowling case, including his contact with defense counsel.

Seifert alleges that, after the Bowling trial, the shunning and harassment continued, and that he was forced into early retirement from the Police Department on December 21, 2005.

The day after Seifert left, Police Chief Ron Miller issued his finding against Seifert in the Internal Affairs investigation, stating that he had violated Department policy by communicating with a defense lawyer without permission.

Upon his retirement, Chief Miller denied Seifert a police reserve commission. Seifert then contacted the Wyandotte County Sheriff's Department, which, under the administration of the previous sheriff, had awarded him a reserve commission.

Two-and-a half years later, in June 2008, the previous sheriff hired Seifert back into the Unified Government as a civilian analyst for the Wyandotte County Sheriff's Department. As a reserve deputy, Seifert worked on some investigations for the previous sheriff.

Defendant Ash was elected Sheriff of Wyandotte County in 2009, and chose Roland to be Undersheriff.

Seifert alleges that on June 11, 2009, just as the Unified Government was settling a civil suit brought by Bowling, that Undersheriff Roland told him that he could no longer work on any investigations for the Sheriff's Office. He also told Seifert that he was "*Giglio*ed" as a result of a 1998 judicial finding in a federal case in which Seifert had been a witness. Ultimately, Judge Vratil granted the defendant's motion to dismiss in that action, but Seifert stresses that while the court "did not credit [his] testimony, she made no finding that he had lied as opposed to being mistaken or otherwise incorrect in his recollection." (Dkt. 55, at ¶ 59).

Seifert contends that this concern was pretext for retaliation, noting that a decade had passed without any concern for his credibility. Seifert alleges that Roland actually made this determination in an attempt to undermine his credibility as the remainder of the Bowling action proceeding to trial against the United States.

Bowling's claims against the federal government were presented to a bench trial beginning in March of 2010. Seifert testified on March 4 and 9. The trial ended April 8, 2010, with the court

ultimately awarding $833,250 in damages to Bowling. *Bowling v. United States*, No. 04-2320-JAR, Dkt. 397 (D. Kan. Sept. 17, 2010).

On April 13, 2010, Undersheriff Roland gave Seifert a memorandum stating that his "Service as a Reserve Deputy is no longer needed at this time," offering no rationale other than referring to the decision as an "administrative action."

On September 17, 2010, Judge Robinson issued her Memorandum and Order in the Bowling case, finding in favor of Bowling and awarding him damages against the United States totaling $833,250. In her Memorandum and Order, Judge Robinson stated that Seifert was the most credible witness at the trial and castigated his superiors at the Police Department for the "shameful" way they had "balkanized" him "for crossing the 'thin blue line.'"

Seifert filed this action on June 9, 2011, alleging in his First Amended Complaint he was subjected to harassment since his first investigation into Bowling's treatment:

> The harassment of Seifert did not cease upon his early retirement from the police department; indeed, it has continued, and even intensified, during his more recent employment with the Sheriff's Department. Thus, the claims stated in this Complaint are continuing in nature, having started on July 11, 2003, and continuing up to the present. During this time, Mr. Seifert has repeatedly been defamed, punished, ostracized, harassed and shunned. He has also suffered a series of adverse employment actions that culminated in the stripping of his Reserve Commission on April 13, 2010.

(Dkt. 4, and ¶ 44).

Seifert alleges in his Second Amended Complaint that the Kansas City, Kansas Police Department and the Wyandotte County Sheriff's Office

> operate in close coordination, with sharing of certain resources and operating in some overlapping areas of jurisdiction. Most importantly, they follow a shared custom or unwritten policy of abiding by the "blue code" — referring to the expectation that all sworn law enforcement personnel will cover up or turn a blind eye to any misconduct

> committed by their law enforcement brethren. Reporting misconduct or "ratting" on
> one's fellow officers violates the code, and results in punishment and reprisals.

(Dkt. 55, at ¶ 3). Prior to becoming Sheriff, Ash worked for 34 years for the Kansas City, Kansas

Police Department, and was a Major assigned to the patrol division.

      Finally, Seifert in his Response repeatedly notes passages from Judge Robison's decision in

which she made credibility assessments as to his testimony. She noted that Police Detective Lane,

in investigating the Bowling case, told Seifert

> that the police department needed to "cover" for the DEA agents, because "you know
> what happened down there." Seifert understood that Lane did not take the statements
> because he was trying to avoid placing his own career at risk or in jeopardy. In
> contrast, Seifert proceeded to investigate the charge of criminal damage to property,
> an investigation that necessarily entailed determining whether the collision was
> intentional. Seifert understood that plaintiff's allegations that the agents had
> committed assault, battery and excessive force were not unrelated to the charge of
> criminal damage to property; at the least, the credibility of the complaining witnesses,
> as well as the motives and intent of plaintiff could not be ignored in investigating the
> crime. So, Seifert conducted a thorough investigation and, presciently, his career was
> not only put in jeopardy, he lost his career over *this* case. Seifert was chastised by his
> managers and ultimately forced out of the police department before he was vested in
> all retirement benefits. Seifert was shunned, subjected to gossip and defamation by
> his police colleagues, and treated as a pariah.

Order of Sept. 17, 2010, at 36 (emphasis in original).

      Judge Robinson further noted:

> Although this evidence largely pertained to plaintiff's conspiracy claims [which were
> dismissed on jurisdictional grounds], the Court is compelled to note that the way
> Seifert was treated was shameful. Seifert was balkanized for crossing the "thin blue
> line." In all respects the Court found Seifert a credible witness, in fact, of all the
> witnesses who testified, Seifert was the most credible. He did not ask to be assigned
> to this case, and in keeping with his characteristic diligence and dedication, which
> had been noted in past evaluations and even written about in a paper authored by his
> supervisor, Seifert attempted to fully and objectively investigate this case. Seifert
> soon determined that there was not even probable cause to charge plaintiff with
> criminal damage to property. He was castigated by his superiors, by the prosecutor,
> by the DEA, and upon his forced retirement, he was denied a commission that would

allow him to obtain work as a security guard, something police retirees typically rely upon to supplement their limited retirement income. Construing language in an opinion authored by another judge in this Court, law enforcement—even in this trial—attempted to paint a false picture of Seifert and impugn his credibility, even while a string of law enforcement witnesses in this case either testified falsely or through omission, in a way that did not represent the entirety of what the three federal agents did on the day in question.

*Id*. at 36 n. 75.

Of course, these findings reflect the *Bowling* court's own factual conclusions of the sharply conflicting evidence presented in that action, *id*. at 1-2, and are not binding on the ultimate fact-finder in this case. At the ultimate trial of this case, the jury in this case must make its own assessment of the facts of the case. At the present stage, Judge Robinson's findings are superfluous — the court in any event assumes for the purposes of the Motion to Dismiss that Seifert's allegations are credible, and that he was forced into retirement from the police department in retaliation for his investigation of the Bowling matter.

**Conclusions of Law**

In their Motion to Dismiss, the defendants seek dismissal of any claims for damages incurred more than two years before the filing of the present action, specifically, any claims arising from incidents occurring before June, 9, 2009. Constitutional claims brought in Kansas pursuant to 42 U.S.C. § 1983 are subject to the state's two-year statute of limitations, K.S.A. 60-513(a)(4). The defendants advance five arguments in support of their motion that the earlier incidents are time-barred: (1) the "continuing violations" theory referenced in the Amended Complaint is a creature of Title VII employment discrimination, and is not appropriate to claims under § 1983; (2) the continuing violations theory in any event is inapplicable under the facts of the case, given that Seifert

6

knew of the ongoing harassment and retaliation at the time it occurred; (3) that the theory cannot be applied because the Sheriff's Department is an independent policy-making entity under Kansas law, not subject to the policies adopted by the United Government, (4) that the conspiracy claims advanced by Seifert under § 1983 and 1985(2) are likewise subject to a two-year limitations period, and that liability only attaches for overt acts occurring within the limitations period; (5) and that plaintiff's state law claims are similarly time-barred.

Seifert combines his response to the Motion to Dismiss with an additional response to the defendant's separate Motion to Stay Discovery (Dkt. 23). In substance, Seifert does not dispute the core of the defendant's limitations argument, explicitly stating that he "agrees that the reach of the 'continuing violations' doctrine appears to be limited in the Tenth Circuit," (Dkt. 30, at 10), but that his references to continuing violations should be interpreted as support for his claim of an ongoing conspiracy by the defendants. Accordingly, "even though certain events may be outside the statute of limitations when considered as discrete acts, they are nonetheless relevant and admissible when considered as part of a conspiracy." *Id*. at 3. He also alleges that the history of his mistreatment is relevant to his *Monell v. Department of Social Services*, 436 U.S. 658, 692 (1978) claim as showing an official policy of retaliation.

The United States Magistrate Judge has denied the stay request, finding that

> even if Judge Marten agrees with defendants' motion [to dismiss], that does not mean that discovery of facts from before the statute-of-limitations date would be automatically cut off from discovery. To the contrary, it is possible and even likely that there would still be relevant and discoverable information from Seifert's time at the police department that would bear on issues of intent, motive, and the alleged conspiracy. And to the extent defendants wish to object to specific discovery requests as being outside the scope of this case, the more proper means of doing that is in the context of a motion to compel rather than in a request to stay all discovery.

(Dkt. 38, at 3).

The court grants the Motion to Dismiss as to all claims for damages arising from acts of harassment or retaliation occurring prior to June 9, 2009. The continuing violations theory is not applicable to § 1983 claims for damages. *See Mercer-Smith v. New Mexico Children, Youth and Families Dept.*, 416 Fed.Appx. 704, 712 (10th Cir. 2011). Even if it were, the doctrine would not preserve Seifert's claims here, as his Complaint makes clear the fact that he was aware of the instances of harassment and retaliation as they occurred. *See Davidson v. America Online, Inc.*, 337 F.3d 1179, 1184 (10th Cir. 2003) ("a continuing violation claim fails 'if the plaintiff knew, or through the exercise of reasonable diligence would have known, [he] was being discriminated against at the time the earlier events occurred'") (quoting *Bullington v. United Air Lines*, 186 F.3d 1301, 1311).

Citing *Robinson v. Maruffi*, 895 F.2d 649, 654-55 (10th Cir. 1990) and *Hunt v. Bennett*, 17 F.3d 1263, 1266 (10th Cir. 1994), the plaintiff argues that it does not matter if discrete acts of wrongdoing fall outside the limitations period, since a claim for conspiracy does not arise until the conspiracy terminates. But *Robinson* involved claims of a conspiracy to cause malicious prosecution. *See* 895 F.2d at 654 (alleged "conspiracy was essentially to cause malicious prosecution"). The case thus rests on "[t]he black-letter rule ... that the statute of limitations on a malicious prosecution claim begins to run upon the termination of the antecedent criminal proceedings." *Nieves v. McSweeney*, 241 F.3d 46, 51-52 (1st Cir. 2001) (citing *Heck v. Humphrey*, 512 U.S. 477 (1994)).

Nothing in *Robinson* or *Hunt* alters the general rule that, whether asserted under § 1983 or § 1985, "the applicable statute of limitations is the same ... and it runs separately from each overt act of the conspiracy that allegedly caused injury. Consequently, [plaintiff] may recover only for the

overt acts that ... occurred within the limitations period." *O'Connor v. St John's College*, 290 Fed.Appx. 137, 141 (10th Cir. 2008). Accordingly, Seifert may recover only for damages caused by overt acts occurring after June 9, 2009.

As noted earlier, the defendants also argue that Seifert's "continuing in nature" claims cannot create liability for the Unified Government, as that entity has no power under Kansas law to set the policies for the Sheriff. *See Meyer v. Nava*, 518 F.Supp.2d 1279, 1289-90 (D. Kan. 2007) (board of county commissioners "has no authority to supervise or discipline the Sheriff or his subordinates") (citing *Lee v. Wyandotte County*, 586 F.Supp. 236, 238 (D.Kan.1984) and K.S.A. 19-805); *Gaston v. Ploeger*, 399 F.Supp.2d 1211, 1225 (D. Kan. 2005) (county commissioners not liable under § 1983 for sheriff's operation of the jail), *rev'd in part on other grds*, 229 Fed.Appx. 702, 2007 WL 1087281 (10th Cir. 2007).

In *Wilson v. Sedgwick County Bd. of County Com'rs*, No. 05-1210-MLB, 2006 WL 2850326, at *3-4 (D. Kan. Oct. 3, 2006), the court observed:

> Kansas statutes do not give policymaking authority to the Commissioners, but rather place such authority on the sheriff, an elected official. Kansas counties derive their power under the home rule statutory scheme, located at K.S.A. 19-101 *et seq*. "Home rule powers are those granted ... by legislative act to units of local government to transact local business and perform such local and administrative duties as these local units may deem appropriate.... Counties in Kansas are empowered to transact all county business ... subject, however, to the prohibitions set forth in [K.S.A. 19-101a]." *Board of Lincoln County Com'rs v. Nielander*, 275 Kan. 257, 62 P.3d 247 (2003). Section 19-101a states that county commissioners cannot "exempt from or effect changes to" K.S.A. 19-805. Section 19-805 governs the powers given by legislature to a county sheriff. The county sheriff is authorized to "appoint, promote, demote and dismiss" his deputies and the sheriff "is responsible ... for the default or misconduct" of his deputies. K.S.A. § 19-805(a). Kansas statutes also clearly provide that county sheriffs are independent elected officials of the county. See K.S.A. § 19-801a.

9

The Kansas Supreme Court has interpreted these statutory sections, and has held that a "sheriff is an independently elected officer whose office, duties, and authorities are established and delegated by the legislature. The sheriff is not a subordinate of the board of county commissioners and neither are the undersheriff or the sheriff's deputies and assistants." *Nielander*, 275 Kan. at 261. The court went on to note that "the sheriff is a state officer whose duties, powers, and obligations derive directly from the legislature and are coextensive with the county board. The undersheriff and the sheriff's deputies and assistants are subordinates of the office of sheriff." *Id*. It is clear therefore, that only the sheriff, not the commissioners, has the power to set policy and train under Kansas law. Thus, plaintiff's claim against defendant based on an execution of policy by defendant that allegedly caused his injuries must fail. Defendant had no authority to make such a policy.

(Footnotes omitted).

Seifert has no response to this line of authority other than to state that the cases "concern counties other than Wyandotte County, and none involves the Unified Government, which is a unique consolidated entity," but otherwise supplies no authority supporting his position. (Dkt. 30 at 13).[1] He further argues that it is appropriate to consider the actions of the Kansas City Police

---

[1] Some earlier cases suggest a different result. For example, in *Fugate v. Unified Government*, 161 F.Supp.2d 1261, 1266 (D. Kan. 2001), the court concluded that the Unified Government was the proper party to answer the alleged actionable misconduct of the Wyandotte County Sheriff's office, relying on *Wright v. Wyandotte Sheriff's Department*, 963 F.Supp. 1029, 1034 (D.Kan.1997); *Farris v. Board of County Commr's*, 924 F.Supp. 1041, 1045 (D.Kan.1996) (stressing that "[t]he sheriff's personnel actions are subject to any 'personnel policies and procedures established by the board of county commissioners for all county employees other than elected officials'" pursuant to K.S.A. § 19-805(d)(1); and *Owens v. Rush*, 636 F.2d 283, 286 n. 3 (10th Cir.1980) (noting in Title VII action that "control over funding gives the Board immense potential power over the employment practices of the Sheriff's department").

But each of these decisions preceded the Kansas Supreme Court's decision in *Nielander*, which emphasized that, although counties enjoy the power of funding and, under § 19-805(d), general employment policies, the ultimate responsibility for employment actions under the Kansas statutes rests with the Sheriff:

The language of K.S.A. 19-805(d) indicates that boards of county commissioners may establish personnel policies and procedures for all nonelected county personnel, pay plans for all nonelected county personnel, collective bargaining agreements or a civil service system, and the budget for the financing of the

Department as supporting his *Monell* claims, as indicative of the general policy of law enforcement in the county. Under *Monell*, § 1983 liability attaches to a governmental entity only by evidence of "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" 436 U.S. at 694. Whether an individual is a policymaker for purposes of § 1983 liability is a legal issue to be determined by the court based on state and local law. *Dill v. City of Edmond*, 155 F.3d 1193, 1210 (10th Cir.1998).

The court accordingly finds that plaintiff may support his claims only to the extent that he demonstrates that the Sheriff's Office adopted or employed the complained-of retaliatory policies. To the extent that the plaintiff seeks to establish liability on the part of the Unified Government for the actions of the Wyandotte County Sheriff's Department in promoting, demoting, or disciplining Seifert, he must demonstrate a policy *of the Sheriff's Department* in 2009 and later to retaliate against whistle-blowers.

This is not to say that the history of the Bowling investigation is irrelevant or inadmissible, and the court finds no grounds for disagreement with the Magistrate Judge's decision not to restrict discovery at the present time. Seifert has alleged that the Sheriff's Department closely or seamlessly

---

operation of the sheriff's office. The introductory phrase of K.S.A. 19-805(d), "[a]ny personnel action taken by the sheriff," however, must not be ignored. While personnel actions taken by sheriffs are "subject to" personnel policies, payment plans, collective bargaining agreements, and budgets established by boards of county commissioners, K.S.A. 19-805(d) does not give county commissioners the ability to supersede a sheriff's power to appoint, promote, demote, or dismiss his or her personnel.

275 Kan. at 266-67.

coordinated policies with Kansas City, Kansas Police Department, and notes that defendant Sheriff Ash was a long-time officer with the KCK Police. The court finds that the plaintiff should be given the opportunity to show that the Sheriff's Department in fact employed a policy of retaliation against whistleblowing officers, and that officers of the Sheriff's Department acted as a part of a conspiracy to give effect to such a policy.[2]

In conclusion, the court finds that he defendants may not be subjected to liability under §§ 1983 or 1985 for acts of harassment or retaliation which occurred prior to June 9, 2009, or for the alleged conspiracy to the extent that this manifested itself by overt acts occurring before that date.

IT IS ACCORDINGLY ORDERED this 26th day of June, 2012, that the defendants' Motion to Dismiss (Dkt. 21) is granted as provided herein.


s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE

---

[2] While plaintiff is accordingly extended some latitude in proving his claim of coordinated police-sheriff policies, plaintiff must demonstrate the relevance of his requested discovery to his complaint, namely, the existence of a policy of retaliation against whistleblowers. In his Second Amended Complaint, Seifert extensively cites "a few of the many examples of improper conduct by law enforcement officers" who were *not* subjected to discipline. (Dkt. 55, at 24-26). Such a generalized laundry list of police misdeeds which incurred no retaliation, such as "[e]ngaging questionable business dealings," or "[a]ssociating with prostitutes," or "[u]se of illegal steroids," would appear to have little, if any, probative value in documenting a policy of retaliation.