IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MAX SEIFERT,

        Plaintiff,

        vs.                Case No. 11-2327-JTM

UNIFIED GOVERNMENT OF WYANDOTTE
COUNTY/KANSAS CITY KANSAS, SHERIFF
DONALD ASH, and UNDERSHERIFF LARRY
ROLAND,

        Defendants.


MEMORANDUM AND ORDER


Plaintiff Max Seifert was removed from his volunteer position with the Wyandotte
County Sheriff's Department in 2010, and alleges that the removal was retaliation for his
testimony in a separate civil rights action. The defendants have moved for summary
judgment on various grounds. For the reasons provided herein, the court finds that
summary judgment should be granted.

Summary judgment is proper where the pleadings, depositions, answers to
interrogatories, and admissions on file, together with affidavits, if any, show there is no
genuine issue as to any material fact, and that the moving party is entitled to judgment as
a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the
court must examine all evidence in a light most favorable to the opposing party. *McKenzie
v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary
judgment must demonstrate its entitlement to summary judgment beyond a reasonable
doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party

need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

*Findings of Fact*

Seifert retired as a detective from the Kansas City, Kansas Police Department in December, 2005. He applied for and was granted a reserve commission by Wyandotte County Sheriff Leroy Green during December, 2005, which is an unpaid voluntary position under K.S.A. § l9-805a.

In June 2008, Seifert was hired by the Wyandotte County Sheriffs Department to work in the jail classifications department as a classification technician, a paid position.

While Seifert was working as a classification technician and before June 2009, he spent additional time conducting investigations as a reserve deputy, fulfilling his reserve

commitment on top of his full-time job.

The Unified Government is a municipal corporation organized and existing under the Kansas law. Defendant Donald Ash was elected Sheriff of Wyandotte County in April, 2009. Sheriff Ash chose Larry Roland as Undersheriff, pursuant to K.S.A. 19-803.

In June 2009, Roland informed Seifert he could no longer work in investigations as a reserve deputy.

Seifert's reserve commission was revoked on April 13, 2010 when he was handed a memorandum signed by Undersheriff Roland stating that the decision to remove his reserve status was an "Administrative action."

### The Barron Bowling Incident

While he was a detective with the KCKPD, Seifert investigated the 2003 incident in which Barron Bowling alleged he had been assaulted by federal DEA agents. Seifert subsequently testified at both the unsuccessful criminal prosecution of Bowling, and the later successful civil rights action brought by Bowling against the federal government.

The defendants submit that no documentary evidence exists that Seifert received a reserve commission from Sheriff Ash.

According to Rickey Whitby, shortly after he was promoted to Chief Deputy in April of 2009, he heard from Assistant United States Attorney Terra Morehead that the Sheriff's Office should not bother sending over files with Seifert's name on them because of *Giglio* issues.[1] Whitby has testified that he reported Morehead's statement up the chain of command to Roland and Ash.

Roland has testified that he contacted Morehead, who confirmed Whitby's

---

[1] The Supreme Court recognized the general obligation of the government to provide a criminal defendant with exclupatory or impeachment evidence in *Brady v. Maryland*, 373 U.S. 83 (1963). Under *Giglio v. United States*, 405 U.S. 150, 154 (1972), the government is obliged to disclose evidence, under Brady standards, which affects the credibility of a witness whose testimony may be determinative of guilt.

statement. She emailed a copy of a judicial decision, and remarked that Seifert had "bungled" investigations. Roland relayed this information to Sheriff Ash. Ash and Roland also spoke with District Attorney Jerome Gorman to determine whether Seifert had issues on case files to be sent to the District Attorney. From this Ash understood that Gorman also believed Seifert had *Giglio* issues.

In his Response, Plaintiff points to relatively insubstantial portions of Morehead's deposition. Thus, she testified that she did not recall talking to Whitby, but did recall that Roland had called her. She testified that it was possible some Sheriff's employees had attended training classes in which she used Seifert as an example of an officer who was not credible.

It is uncontroverted that Morehead emailed Roland on June 29, 2009 about her concerns with Seifert, including a copy of Judge Vratil's decision in *United States v. Elam,* No. 98-20037-KHV (D. Kan 1998), in which she sustained a defendant's motion to suppress after explicitly concluding that Seifert's testimony "lacks credibility."

> Here is the order from the federal case. They have the hearing transcript on order and I'll forward that to you when we get it. I never knew about this ruling until I came over in 2002, but since I've been here, and before Max retired from KCKPD, we had several issues with him bungling investigations that he knew were going to be federal cases.

The plaintiff suggests that Morehead's testimony is false because she testified in her deposition that she did not give any explicit "advice" to the Sheriff's Department as to what to do with Seifert. But this acknowledgment is relatively minor; no one contends that the Assistant U.S. Attorney Morehead was in any position give specific or authoritative legal advice to the Wyandotte County Sheriff's Department. What is contended, and uncontroverted, is that Morehead told the Sheriff's Department in 2009 that Seifert had credibility problems under *Giglio*.

With respect to Gorman, the plaintiff similarly suggests that Roland and Ash's respective versions of events are "manufactured" and false, again because of relatively

minor variations in the testimonies of Roland, Ash, and Gorman. As noted above, Roland and Ash testified that Gorman told them that his office also had *Giglio* issues with Seifert, saying that Gorman said he "can't use cases" from Seifert. In his deposition, Gorman was asked if he had said that he "would not take cases from Max Seifert." Gorman said, "I don't believe I used those terms," but asked for what he did say, it was hardly favorable to Seifert:

> I believe the words that I would have used is that as – from my reading of that case, that I believe that there is a *Giglio* issue there, and that I would have had to -- to look at any case that they would have brought to me on a case-by-case decision knowing that I believe that there's a *Giglio* issue. I would have had to take that into concern – and I would have had to take that into consideration.

He further testified that "[i]f he was going to be a witness, I would have to disclose it [Judge Vratil's decision in *Elam*] to the defense." Asked further about this concern, Gorman paraphrased the question as "are you saying I would I have hesitated in filing a case because of that? ... It would have caused me concern, yeah."

More substantively, the plaintiff suggests that Roland and Ash's version of events is false by construing Gorman to indicate that he first learned of the Seifert *Giglo* problem in 2010, not 2009. This is a misconstruction of Gorman's testimony based on questions from counsel about a February 9, 2010 "cease and desist" letter from Seifert's attorney, demanding that Gorman should stop saying that Seifert was "Giglioed."

While Gorman testified that he first read the *Elam* decision after receiving the February 9, 2010 cease and desist letter, he does *not* testify that this was the first time he learned about potential *Giglio* problems with Seifert. To the contrary, Gorman testified that he received the letter after he had conducted a series of law enforcement training sessions with AUSA Morehead in which she described Seifert's *Giglio* problems. Gorman explicitly testified that he did not remember what year the training sessions began, but the uncontroverted testimony is that these sessions occurred in 2009.

During those [training session] conversations, Terra [Morehead] would

bring up that officers have obtained or gotten *Giglio* issues in the past, and she mentioned that – I believe this would have been after Max was -- had left the Kansas City, Kansas Police Department, because I think it was put that, you know, former Detective Seifert had a *Giglio* issue.

Gorman was asked directly if he had "any clue" about Seifert's credibility problem prior to 2010, and he indicated that he "had no *direct* knowledge of [the *Elam* decision] until then," but clarified that he had heard talk of it before. (Gorman dep. at 27) (emphasis added). As noted earlier, it is uncontroverted that Morehead forwarded to Roland and Ash a copy of *Elam* on June 29, 2009.

In sum, the uncontroverted evidence is that in mid-2009 Roland and Ash learned from both federal and state prosecutors that they had substantial problems with cases involving Seifert because of credibility issues.

At this time, as Seifert was working as a reserve deputy, there were only three detectives assigned, and Ash and Roland learned one of the three also had a *Giglio* issue. Because of the *Giglio* issue, defendants demoted the detective, removing her from investigations.

According to Ash and Roland, they took Seifert off investigations because they learned he had *Giglio* issues with Morehead and Gorman. They believed that whether Seifert had *Giglio* issues was not their call, but a call made by the prosecutors.

It is uncontroverted that Seifert was told by Roland that he was being removed from investigations because Gorman and Morehead told the Sheriff's office that Seifert was not credible. Seifert has testified that he felt Roland was being candid when he told him that he was no longer part of investigations because of the statements by Gorman and Morehead.

Seifert is not a bargaining unit member of the Fraternal Order of Police 40, which is the collective bargaining unit that represents certified law enforcement officers in the Sheriff's Department. He is represented by the Teamsters.

According to the defendants, the Sheriff's Department in 2010 was short-staffed in

the detention center, and Sheriff Ash decided that the reserve deputies would be assigned to the jail to alleviate staffing problems in the jail. Undersheriff Roland told Seifert that he could have his reserve commission if he was willing to work in the jail, but Seifert refused.

Seifert attempts to controvert these facts by pointing out that emails on reserve officer training were sent to other officers, and not to him. However, Seifert directly acknowledged in his deposition that he knew that if he agreed to work in the jail he could have his commission. But Seifert refused to work in the jail because he feared if his credibility was in issue and if a criminal event occurred, he would not be believed.

Seifert's office as a classification technician is in the jail.

Although Seifert was removed from the volunteer and unpaid position of reserve commission deputy, he remains employed as a classification technician, a civilian position, in the Wyandotte County Sheriff's Department.

## Conclusions of Law

### 1. Reserve Commission

The defendants first argue that Seifert's First Amendment claim fails because he had no legal right to continue holding the reserve commission once Sheriff Ash was elected. After the present lawsuit, they contend, they discovered that Seifert's appointment was automatically revoked at the time of the new election under K.S.A. 19-805a. Thus, "[h]ad this lawsuit never arisen, Sheriff Ash and Undersheriff Roland would still be operating under the erroneous assumption that reserve deputies maintain commissions after a new sheriff is elected." (Dkt. 198, at 13).

K.S.A. 19-805a provides:

**Special deputies; appointment, revocation; bonds**

In all counties, the sheriff shall have authority to appoint so many special deputies as the sheriff deems proper and for whose official acts the

7

sheriff shall be responsible. Before an appointment shall be made the sheriff or marshal of the district court shall have the right to demand an indemnity bond before any commission as special deputy shall be issued. The appointments may be revoked at the pleasure of the appointing officer, *except that all appointments made by a sheriff pursuant to this section shall automatically be revoked at the time that such appointing sheriff's service as sheriff concludes.* Except as provided by K.S.A. 19-827, and amendments thereto, a special deputy appointed under this section shall not receive any payment, for services rendered, from public funds.

(Emphasis added).

Seifert responds by making two arguments. First, he argues that the defendant's position that his prior appointment was "automatically ... revoked" under the statute is factually inconsistent with their argument that they would have allowed him to continue serving his commission if he was willing to work in the jail. (Dkt. 193, at 38). But, as defendants note, the Federal Rules of Civil Procedure do not restrict a party to a single theory or defense. Fed.R.Civ.Pr. 8(d)(3) specifically allows a party to advance inconsistent theories.

More substantively, Seifert argues that he continued to have a reserve commission during Ash's tenure. Here, it must be noted that the defendants do not prove that they ever resisted Seifert's continued tenure, only that they "examined their records and could not find any records showing that Ash had actually granted a commission to plaintiff." (Dkt. 180, at 8). In contrast, there is evidence that Seifert continued to act as reserve commission deputy, and was listed on the reserve commission deputy roster list in 2009.

K.S.A. 19-805a does not provide any particular formality for the reappointment of a special deputy, other than the apparently optional right given to the sheriff to require a bond. Given all of the facts of the case, the court finds that a rational fact finder could conclude that Ash did reappoint Seifert to the reserve commission position. Accordingly, the court finds that the defendants are not entitled to summary judgment on the ground

sought.[2]

## 2. First Amendment Claim

The First Amendment prohibits governmental actors from unduly restricting the free speech rights of their employees. *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). The Tenth Circuit has summarized the five essential elements of a First Amendment made on behalf of a government employee.

> After the Supreme Court's recent decision in *Garcetti* [*v. Ceballos*, 547 U.S. 10 (2006)], it is apparent that the "*Pickering*" analysis of freedom of speech retaliation claims is a five step inquiry which we now refer to as the "*Garcetti/Pickering*" analysis. First, the court must determine whether the employee speaks "pursuant to [his] official duties." *Garcetti*, 126 S.Ct. at 1960; *see also Mills* [*v. City of Evansville*], 452 F.3d [646,] 647 [(7th Cir. 2006)] ("*Garcetti* ... holds that before asking whether the subject-matter of particular speech is a topic of public concern, the court must decide whether the plaintiff was speaking 'as a citizen'...."). If the employee speaks pursuant to his official duties, then there is no constitutional protection because the restriction on speech "simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Garcetti*, 126 S.Ct. at 1960. Second, if an employee does not speak pursuant to his official duties, but instead speaks as a citizen, the court must determine whether the subject of the speech is a matter of public concern. *See Green v. Bd. of County Comm'rs*, 472 F.3d 794, 798 (10th Cir.2007); *Mills*, 452 F.3d at 647–48. If the speech is not a matter of public concern, then the speech is unprotected and the inquiry ends. Third, if the employee speaks as a citizen on a matter of public concern, the court must determine "whether the employee's interest in commenting on the issue outweighs the interest of the state as employer." *Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1327 (10th Cir.2007). Fourth, assuming the employee's interest outweighs that of the employer, the employee must show that his speech was a "substantial factor or a motivating factor in [a] detrimental employment decision." *Lybrook* [*v. Members of Farmington Mun. Schs. Bd. of Educ.*], 232 F.3d [1334,] 1338 [(10th Cir. 2000)] (internal quotation marks omitted). Finally, if the employee establishes that his speech was such a factor, "the employer may demonstrate that it would have taken the same action against the employee even in the absence of the protected speech." *Id.* at 1339 (internal quotation marks omitted). The first three steps are to be

---

[2] On the other hand, the ultimate finder is *not required* find in favor of Seifert on the issue, as the evidence in support of such reappointment is not as strong as Seifert suggests. For example, Seifert supports his claim of reappointment based on his contention that the April 13, 2010 memo which Roland and Sargeant David Thaxton gave to him "revoked" the commission. (Dkt. 193, at 9). But the memo itself does not imply any reappointment or revocation, stating only that "[y]our service as a Reserved Deputy is no longer needed at this time."

resolved by the district court, while the last two are ordinarily for the trier of fact. *See Cragg v. City of Osawatomie*, 143 F.3d 1343, 1346 (10th Cir.1998).

*Brammer-Howelter v. Twin Peaks Charter Academy*, 492 F.3d 1192, 1202-03 (10th Cir. 2007) (footnote omitted).

The defendants first argue that Seifert's First Amendment claim fails because his testimony in the *Bowling* cases arose from his police investigation of alleged misconduct by DEA Agents, and thus was pursuant to his official duties. Second, they contend that the evidence shows that they were not acting in retaliation, but because of the concerns expressed by prosecutors that Seifert had credible issues. Third, they contend that they would have made the same decision anyway, since the assessment of credibility was an issue best left to the prosecutors.[3]

As noted earlier, under *Garcetti*, an employee's speech which is made pursuant to his professional duties is not protected under the First Amendment. The Tenth Circuit addressed the issue of *Thomas v. City of Blanchard*, 548 F.3d 1317, 1324 (10th Cir. 2008) the nature of this inquiry:

> The question under *Garcetti* is not whether the speech was made during the employee's work hours, or whether it concerned the subject matter of his employment. *See id.* at 421, 126 S.Ct. 1951. Merely because an employee's speech was made *at* work and *about* work does not necessarily remove that employee's speech from the ambit of constitutional protection. *See Brammer-Hoelter*, 492 F.3d at 1204. Rather, it is whether the speech was made pursuant to the employee's job duties or, in other words, whether the speech was "commissioned" by the employer. *Garcetti*, 547 U.S. at 421-22, 126 S.Ct. 1951. In addressing that question, the Supreme Court deliberately refrained from defining a "comprehensive framework for defining the scope of an employee's duties." *Id.* at 424, 126 S.Ct. 1951. It instead emphasized that the inquiry was "a practical one," and that a court cannot simply read off an employee's duties from a job description because "formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform." *Id.* at 424-25, 126 S.Ct. 1951.

(citations and quotations omitted, emphasis in original). The court further stressed that

---

[3] The defendants make no substantial argument with respect to either the second or third elements of the *Garcetti/Pickering* test, making arguments which are either purely conclusory or directly dependent on their arguments as to the other elements (Dkt. 180, at 12).

Tenth Circuit precedents after *Garcetti* had generally taken a broad view of speech that is "pursuant" to an employee's official duties. 548 F.3d at 1824 (citing Raj Chohan, Note, "Tenth Circuit Interpretations of *Garcetti*: Limits on First Amendment Protections for Whistle-Blowers," 85 DENV. U.L.REV. 573, 584 (2008)).

Plaintiff argues in his Response that *Garcetti* cannot apply because he conducted his underlying investigation into the Bowling incident, and testified at the *Bowling* criminal trial, while he was employed by the KCKPD, not by the Wyandotte County Sheriff's Department. He did testify during the *Bowling* civil trial during his tenure at Wyandotte County, but argues that such testimony was unrelated to his specific duties as civilian analyst and volunteer investigator pursuant to his reserve commission. He stresses that after joined the sheriff, he may have "worked some limited investigations [but] they did not involve the Bowling investigation," and indeed the department had removed him from all investigations prior to his civil trial testimony. (Dkt. 193, at 41). Plaintiff contends that no case has extended *Garcetti* to their actions taken prior to their employment by the defendant.

The defendants' argument in their Reply is brief, contending that Seifert's "testimony in the *Bowling* case "most certainly [was] part of his duties a[s] an employee of the defendant *Unified Government's* police department." (Dkt. 198, at 14) (emphasis in original).

The court finds that the artificial distinction between the KCKPD (Seifert's original employer) and the Wyandotte County Sheriff's Department (his subsequent employer) does not by itself preclude the application of *Garcetti*, given the unique (in Kansas) nature of the City/County Unified Government, nor does the limitation placed on his further investigation while at the Sheriff's Department. "[S]peech may be made pursuant to an employee's official duties even if it deals with activities that the employee is not expressly required to perform." *Brammer-Hoelter*, 492 F.3d at 1203.

As noted earlier, the Tenth Circuit has taken a broad view of what constitutes speech as a part of an employee's duties. Whether employed as a KCKPD police officer or a Wyandotte County Sheriff's Department reserve special deputy, an integral part of Seifert's duties was the investigation and reporting of his knowledge of criminal activities. Reporting the results of his investigations to his superiors would be speech which "reasonably contribute[d] to or facilitate[d]" that duty, and would fall under *Garcetti*. *See Brammer-Hoelter*, 492 F.3d at 1203. Such actions "stemmed from and were the type of activities that [Seifert] was paid [or, here, volunteered] to do." *Green v. Bd. of County Comm'rs*, 472 F.3d 794, 801 (10th Cir.2007).

However, while Seifert's relation of the results of his investigation within the Sheriff's Department or the KCKPD is not be protected under the First Amendment, the court must determine whether his trial testimony is protected. The Third Circuit has held that *Garcetti* does not apply to a police officer's public testimony at trial, since"[i]t is axiomatic that every citizen owes to his society the duty of giving testimony to aid in the enforcement of the law." *Reilly v. City of Atlantic City*, 532 F.3d 216, 228 (3rd Cir. 2008). On the other hand, the Ninth Circuit has directly rejected the conclusion in *Reilly*, finding that the case contradicted the Supreme Court's emphasis in *Garcetti* distinguishing between an employee's job duties and private capacity speech. *Huppert v. City of Pittsburg*, 574 F.3d 696, 708 (9th Cir. 2009). The Eleventh Circuit has also held that the *Garcetti* analysis "is not affected by the fact that the plaintiff made the statements in testimony." *Green v. Barrett*, 226 Fed.Appx. 883, 886 (11th Cir. 2007) (citing *Morris v. Crow*, 142 F.3d 1379, 1381 (11th Cir. 1998).

As noted earlier, *Reilly* rests on the "axiom" that testifying in court is a general civil responsibility. But, as noted in *Bowie v. Maddox*, 653, F.3d 45, 48 (C.A.D.C. 2011), this sort of approach

gets *Garcetti* backwards. The critical question under *Garcetti* is not whether the speech at issue has a civilian analogue, but whether it was performed

"pursuant to ... official duties." 547 U.S. at 421, 126 S.Ct. 1951; *cf. Winder v. Erste*, 566 F.3d 209, 215 (D.C.Cir.2009) ("[A]lthough testimony before a city council might otherwise be just the sort of citizen speech protected by the First Amendment, the uncommonly close relationship between [the plaintiff's] duties and his advocacy before the council precludes protection."). A test that allows a First Amendment retaliation claim to proceed whenever the government employee can identify a civilian analogue for his speech is about as useful as a mosquito net made of chicken wire: All official speech, viewed at a sufficient level of abstraction, has a civilian analogue. Certainly the district attorney's memo in *Garcetti* was analogous in some sense to private speech—for example, testimony or argumentation on the same subject by the criminal defendant it concerned. Critically, though, Ceballos's memo was composed as part of his government job, and the Supreme Court unambiguously "reject[ed] ... the notion that the First Amendment shields from discipline the expressions employees make pursuant to their professional duties." *Garcetti*, 547 U.S. at 426, 126 S.Ct. 1951.[4]

The court here follows the Ninth and Eleventh Circuits, and holds that the plaintiff's trial testimony, which stemmed directly from his police investigation, is conduct which related to his official duties. *See Truel v. City of Dearborn*, No 11-10921, 2012 WL 4340847, *7 (E.D.Mich. 2012) (finding *Garcetti* was applicable because investigations and testifying in court were duties of the plaintiff police officer).

Further, the court finds that the plaintiff has failed to present any substantial evidence showing that the reserve commission was revoked in retaliation for his *Bowling* testimony. In First Amendment actions, the questions of underlying motivation and inevitable result, are "ordinarily for the trier of fact." *Brammer-Howelter*, 492 F.3d at 1203. However, summary judgment may be appropriate where, as here, the plaintiff's evidence of motivation simply fails to establish any reasonable inference of a retaliatory motive.

Here, the defendants have presented credible evidence that they were motivated by the independent concerns of prosecutors, who expressed serious concerns about the utility of Seifert's testimony. Moreover, these concerns about Seifert's credibility were not

---

[4] In *Bowie*, the court was addressing the Second Circuit's conclusion in *Jackler v. Byrne*, 658 F.3d 225 (2d Cir. 2011), that the First Amendment applied where a probationary police officer was allegedly pressured into submitting a false report, on the grounds that such a report was analogous to a private citizen's refusal to make a false report.

manufactured out of whole cloth, but generated by a specific criticism of his credibility in an Order issued by a judge of this District.

Against the defendant's evidence, the plaintiff argues that the facts show that his reserve commission was terminated at the same general time as the occurred at the same general time that the *Bowling* civil trial was proceeding to the point of settlement, and that other officers were allowed to remain on staff at the Sheriff's Department event though they had *Brady* issues.

To take the former argument first, the court finds that the plaintiff has failed to show that the defendants ignored similar *Giglio* issues as to similarly-situated officers. Instead, plaintiff has simply shown that the Internal Affairs Unit of the KCKPD maintained a "Brady List" listing of officers by name. Seifert presented a copy of the Brady List to KCKPD Police Chief Ricky Armstrong, who stated he had no personal knowledge of it. Counsel also presented the list to District Attorney Gorman in his deposition. Gorman testified that he could not recall whether he had or had not disclosed *Brady* of *Giglio* information as to specific officers. Gorman also testified that it was his understanding that some of the officers listed had left the Police Department.

The plaintiff has made no showing that the officers on the Brady List presented concerns similar to his own. No witness has shown any familiarity with it or even knowledge of it. Of the 33 officers on the list, the most common citation is a violation of "3.22 " which the list indicates is a general competence requirement. Only three officers are cited for a violation of "3.23," indicating dishonesty. The plaintiff supplies no evidence as to the specifics of any of these violations. There is no evidence that the any of these officers (the Brady List includes violations beginning in 1987) remained with the KCKPD in 2009. Since this is a list dealing with KCKPD police officers, it necessarily deals with persons who were not similarly situated to Seifert – an unpaid, volunteer Sheriff's reserve deputy. Finally, there is no indication that any prosecutor directly advised the defendants (as they

did with Seifert) that such officers had serious *Brady* or *Giglio* issues.

In this context it is relevant to note both the uncontroverted fact that the Wyandotte County Jail needed additional manpower, and that reserve commission officers were being asked to volunteer for this assignment. Seifert was asked to do so, with the understanding that he could continue his services if he agreed. He refused. Further, at about the same time the defendants learned of *Giglio* issues with Seifert, they learned of similar problems with another Sheriff's investigator, and the defendants took the same action they did with Seifert, relieving her of investigatory responsibilities.

Given Seifert's limited, volunteer status with the Sheriff's Department, the uncontroverted need for additional manpower at the jail, and the fact that the defendants were independently informed that Seifert was being used as a case study in bungling detective work in presentations by local and federal prosecutors, the court finds no basis for an inference of retaliation in their decision to continue with his services.

Seifert's other argument in support of an inference of retaliation is his suggestion that his services were eliminated at the same time as the *Bowling* civil settlement. An inference of retaliation may arise when an adverse job action closely follows protected activity. *See Chavez v. City of Arvada*, 88 F.3d 861, 866 (10th Cir.1996). "However, unless the termination is *very closely* connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation." *Anderson v. Coors Brewing*, 181 F.3d 1171, 1179 (10th Cir. 1999) (citing *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir.1997)) (emphasis in *Anderson*). Moreover, even very close temporal proximity "is meaningless unless those who caused the alleged retaliatory act are shown to have been aware of the specific activity." *Hysten v. Burlington N. & Sante Fe Ry.*, 296 F.3d 1177, 1184 (10th Cir. 2002).

Here, Seifert has failed to establish any particularly close temporal proximity. The decision to restrict Seifert's investigations at the Sheriff's Department occurred in June of

2009, very shortly after the Sheriff learned of AUSA Morehead's concerns about Seifert's credibility. At the time they decided to remove Seifert from investigations, Roland and Ash had no knowledge of any ongoing participation by Seifert in an supposed protected activity. Seifert did not testify in the *Bowling* civil case until March 4, 2010. (Dkt. 193-3 Exh. C). When Seifert's commission was rescinded in 2010, he had already been relieved of investigatory duties for the better part of a year due to the *Giglio* issue.[5]

The court reaches a similar result with respect to the fifth and final element of the *Garcetti/Pickering* analysis. The evidence is simply uncontroverted that the defendants would have implemented the same decision regardless of his *Bowling* testimony. The evidence is clear that the jail faced a manpower shortage in 2010, that reserve deputies (including Seifert) were being asked to volunteer for work in the jail, that Seifert could have kept his reserve commission had he agreed to do this volunteer work, and that at the time the commission was revoked Seifert had been suspended from investigation for ten months due to the independent concerns of prosecutors over his credibility. Plaintiff has failed to controvert the defendants' evidence that, in issues of credibility, law enforcement agencies may properly defer to the opinions of experienced prosecutors.

Accordingly, the court finds that the plaintiff's First Amendment claim fails because the testimony in the *Bowling* cases stemmed directly from his duties as a public law enforcement officer, because the plaintiff has failed to provide evidence creating a reasonable inference of retaliation, and because the defendants in any event would have ultimately adopted the same decision regardless of the *Bowling* testimony.

---

[5] Seifert also argues that the 1998 *Elam* decision that he was not a credible witness was then old news, but the government's obligations under *Brady* and *Giglio* are not subject to a statute of limitations. For purposes of drawing an inference of retaliation from temporal proximity, the only event occurring immediately before Seifert's suspension from investigations was Sheriff's Ash's discovery that prosecutors were essentially using Seifert as a text book example of a suspect witness.

### 3. Corporate Liability

The defendants argue both as a general matter that they did not take action against Seifert because of his *Bowling* testimony, and that the plaintiff has failed to come forward with any evidence of a general policy or practice of retaliation or conspiracy which might subject the Unified Government to liablity. Generally before a municipal corporation may be subjected to liability under federal civil rights laws, the plaintiff must show that the defendant adopted practices or procedures which facilitated the violation. *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). The court agrees.

In response to the defendants' summary judgment motion, the plaintiff properly notes the requirements of *Monell* and related decisions, but completely fails to demonstrate any actual pattern or practice of retaliation or conspiracy to retaliate against persons with similar *Giglio* issues. Instead, Seifert essentially repeats his earlier factual arguments of collusion and "manufactured" testimony.

However, as noted earlier, the facts reveals precisely one similarly-situated Sheriff's investigator with a similar *Giglio* issue. Both that officer and Seifert were relieved of their investigatory responsibilities. Moreover, Seifert's suspension occurred immediately after Sheriff Ash learned of prosecutors' concerns about Seifert's credibility, and months *before* Seifert's testimony in the *Bowling* civil trial. Considering all of the evidence in the case, the court finds that the plaintiff has failed to show the existence of a pattern or practice of retaliation, or any other basis for imposing liability against the Unified Government.

### 4. Conspiracy

The defendants contend that the plaintiff has failed to show any specific evidence of a conspiracy to retaliate against him because of his testimony in *Bowlíng v. U.S.A.* The court agrees, and finds that summary judgment should issue as to Seifert's conspiracy claim.

There is no evidence of a conspiracy in either the 2009 suspension of Seifert's investigatory responsibilities and in the 2010 termination of his reserve commission. There is no evidence that Sheriff Ash or Undersheriff Roland entered into any illegal agreement with AUSA Morehead or District Attorney Gorman. Rather, as noted above, the evidence indicates simply that Morehead and Gorman told Ash and Roland of their concerns over Seifert. Ash and Roland did not act illegally in giving weight to the opinions of these prosecutors.

In his Response to the Motion for Summary Judgment, Seifert essentially repeats his general allegations that the prosecutors' actions were "highly suspect." (Dkt. 193, at 53-54). But ultimately the facts remain the same, the plaintiff has failed to show that the prosecutors ignored expressed prosecutorial concerns of similar gravity against similarly situated officers. Accordingly, the court grants summary judgment in light of this failure of proof.

However, the court rejects the defendants' additional argument that they are entitled to summary judgment on the conspiracy claim because Seifert has failed to show a property interest in the volunteer reserve deputy commission. The defendants argue that by its express terms § 1985(2) prohibits conspiracies which seek to either deter or prevent another from testifying at trial, or "to injure such party or witness in his person or property" after the testimony. Since Seifert here makes no allegation that Ash and Roland sought to prevent his testimony in *Bowling*, but retaliated against him after he did so, defendants contend that the§ 1985(2) requires the demonstration of a property interest in the reserve commission. (Dkt. 180 at 16; 198 at 24-25). In advancing this argument, defendants explicitly cite the Supreme Court's definition of property interests in due process cases in *Bishop v. Wood*, 426 U.S. 341, 344 (1976).

But the Supreme Court has subsequently found that a conspiracy claim under § 1985(2) does not require the infringement of a property right as defined in *Bishop v. Wood*.

We disagree with the Eleventh Circuit's conclusion that petitioner must suffer an injury to a "constitutionally protected property interest" to state a claim for damages under § 1985(2). Nothing in the language or purpose of the proscriptions in the first clause of § 1985(2), nor in its attendant remedial provisions, establishes such a requirement. The gist of the wrong at which § 1985(2) is directed is not deprivation of property, but intimidation or retaliation against witnesses in federal-court proceedings. The terms "injured in his person or property" define the harm that the victim may suffer as a result of the conspiracy to intimidate or retaliate. Thus, the fact that employment at will is not "property"for purposes of the Due Process Clause, *see Bishop v. Wood*, 426 U.S. 341, 345-347, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), does not mean that loss of at-will employment may not "injur[e] [petitioner] in his person or property" for purposes of § 1985(2).

*Haddle v. Garrison*, 525 U.S. 121, 125-26 (1998).


## 5. Qualified Immunity

When faced with a claim of qualified immunity, the court must address (1) whether the plaintiff has alleged a violation of a constitutional right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct. *Harlow v. Fitzgerald*, 457 U.S. 800, 815-16 (1982); *Scott v. Hern*, 216 F.3d 891, 910 (10th Cir. 2000) ("the plaintiff has the heavy burden of establishing: (1) that the defendant's actions violated a federal constitutional or statutory right; and (2) that the right violated was clearly established at the time of the defendant's actions").

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir.2012) (quotation omitted). Further, "the right allegedly violated must be established, not as a broad proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official." *Reichle v. Howards*, ___U.S. ___, 132 S.Ct. 2088, 2094, 182 L.Ed.2d 985 (2012). "The additional level of specificity is helpful to focus on case law that would have given [defendants] 'reasonable warning that the conduct then at issue violated constitutional rights.'" *Stewart v. Beach*, 701 F.3d 1322, 1331 (10th Cir.

2012) (quoting *United States v. Lanier*, 520 U.S. 259, 269 (1997)).

The plaintiff addresses the issue of qualified immunity, but only at the most general level possible, citing decisions such as *Wren v. Spurlock*, 798 F.2d 1313, 1318 (10th Cir. 1986), which applied the *Pickering* test in the case of alleged retaliation against a public school teacher. (Dkt. 193 at 51). This is of course the opposite of the specific contour inquiry required by *Reichle*. Moreover, it may be noted that *Wren* was decided two decades before *Garcetti*. Necessarily, the decision has little relevance to the explicit split of authorities noted earlier by the court as to whether *Garcetti* applies in the case of public testimony by a law enforcement officers. Given this split, and the clear failure of plaintiff to point to controlling precedent or weight of authority, the court concludes that the law relating to Seifert's First Amendment rights was not clearly established, and that defendants are entitled to qualified immunity.

### 6. Alternative Remedies

The defendants argue that Seifert has no pendent state law claim for retaliatory discharge under the alternative remedies theory. Under this doctrine, the state claim for retaliatory discharge is suspended if there is "a state or federal statute [which] provides an adequate alternative remedy." *Flenker v. Willamette Industries,* 266 Kan. 198, 202, 967 P.2d 295 (1998). This court has explicitly found that 42 U.S.C. § 1983 provides such a remedy, and that a Kansas common claim for retaliatory discharge will not be recognized when based upon this federal statutory right. *Tollen v. City of El Dorado*, No. 11-1182-JWL, 2012 WL 10353 (D. Kan. Jan. 3, 2012).

In his Response, Seifert acknowledges *Tollen* may preclude any claim for retaliatory discharge, given his First Amendment claim under § 1983. He asserts however, that this ruling explicitly applies only to claims under § 1983, while he has also advanced a claim for conspiracy under § 1985. The court finds that the suggested distinction is without merit.

Both § 1983 and 1985 define the violations of federal law, but in both instances damages are awarded under § 1988. The plaintiff has supplied no reason at all why the federal statutes would fail to provide him an adequate remedy for his claims of conspiracy or infringement of his First Amendment rights. Accordingly, the court grants summary judgment as to Seifert's state law claims consistent with *Tollen*.[6]

IT IS ACCORDINGLY ORDERED this 12th day of June, 2013, that the defendants' Motion for Summary Judgment (Dkt. 179) is hereby granted.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE

---

[6] Given this conclusion, the court need not address defendants' further argument that Kansas would not recognize a retaliation claim for the termination of an explicitly voluntary, unpaid position. The argument is expressly advanced as a fallback argument in the event that the court declines to apply the alternative remedy theory. (Dkt. 180, at 20).